And our third case is Amgen v. Apotex. Mr. McTighe, yes, may it please the court, your honor. My name is Kerry McTighe from the law firm of Kozen O'Connor. I'm here on behalf of Apotex Inc. and Corp. Your Honor, the BPCIA was a carefully crafted congressional statute. It created a framework with choices for both the RPS, in this case Amgen, as well as the biosimilar applicants, in this case Apotex. In the gray brief, Apotex says Amgen does not need an additional 180 days to assess an act upon its patent rights because it has already sued Apotex on all the patents on its paragraph 13A list. There's nothing left to assess or to assert. What purpose does the 180-day provision serve as you interpret it under the facts of this case? So under the facts of this case, your honor, the biosimilar applicant does not have to follow the notice of commercial marketing, but that choice has a repercussion. The L-9 provision, specifically L-9A, prevents either party from filing a DJ action until that notice of commercial marketing exists. With L-9B, however, should Apotex choose not to file that, then the right to a DJ action inures only to the RPS. So Apotex has to make a choice. With this second phase or second wave of litigation, does it want the certainty of filing the notice of commercial marketing and giving itself the right to sue before launching in the face of Again, it's a choice. But what the district court has done is said, in all cases, we are going to make the notice of commercial marketing mandatory even when Apotex has provided the L-2A exchange, meaning that in that case, the RPS has had the application, has had the opportunity to sue, litigate, and bring an injunctive relief should Apotex give the notice of commercial marketing, but it also could bring injunctive relief on all of the patents listed in that initial phase, the L-2, L-3, 4, 5 phase. Now, we're not before this court on any patent-based injunction. We're here on a notice provision. And so on that notice provision that we're talking about, what we look at is the statute itself, the plain meaning of the statute. Congress obviously created a statute with choices. One of those choices is for an applicant, and this court came down in Sandovy-Emden with the decision that because there's a specific remedy in L-9C, the shall provision in L-2 was not mandatory because there was that specific remedy in L-9C. And what the court did was apply maxims of statutory construction that exist in this case too, specifically the first one, to not render any provision of the statute superfluous. What incentive would an applicant have to participate in an information exchange if the 180-day provision is imposed no matter what? Well, that's a great question, Your Honor, because actually with Apotex's interpretation, if you choose to participate in the L-2 exchange, you are not then bound that the L-8A notice of commercial marketing provision is mandatory in all cases. You could see the example where there are no statutes left to litigate, and subsection L is about litigating the patents. So if you choose to go through the L-2A process, which this court acknowledged is optional, but if you choose to do that, what you get is the benefit of potentially not using the notice of commercial marketing. But then again, a biosimilar applicant could use that. In fact, all the time in the Hatch-Waxman context, we see generic companies not launch at risk because they want the certainty of those patents. Biosimilars, and you've seen it in the Meeki briefs, are very complex. Oftentimes they deal with billions of dollars. It's very possible that, as Apotex did here, choose to follow the L-2 exchange, and it's very possible that for that same reason, for that same certainty, they choose to follow the notice of commercial marketing. Why it was not mandatory in the Sandovy-Amgen case by the majority was because of those maxims of statutory construction. If you were to say that the L-2 exchange was mandatory in all circumstances, then it would render L-9C superfluous. In that same regard, and the court quoted from the Supreme Court case in TRW, Inc., Andrews, it's a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant. The Amgen reading would say that the L-9B provision, which specifically says if there's a violation of L-8A, the commercial marketing provision, the remedy for that is a declaratory junction. And what they could do is bring a patent-based injunction on anything at that point. But we're not here on a patent-based injunction. Similarly, Your Honor, the second maximum of statutory construction is that when Congress creates a new right, and clearly the notice of commercial marketing is a new right. In most cases, the companies that are accused of infringement don't have to give a notice of commercial marketing 180 days in advance. Here in the BPCIA, Congress put that in there. But when Congress creates a new right in a statute and expressly provides a remedy for that violation, in this case, the right for a DJ, then the agreed party's relief should be limited to that statutory remedy. Go ahead. It's cited throughout the briefs, Your Honor, but it's Bruce Juice versus American Cancer. I understand that in this case there are no L-7 patents, shorthand. No patents that are either newly issued or were not included in the L-6 group of patents. Do you think that the analysis of L-8A would be different with respect to cases in which there are L-7 patents? No, Your Honor, because the L-7 patents, there's a procedure in there for the RPS to bring those patents, if they so choose, into the litigation. But what L-8A refers to is a notice of commercial marketing that you must give that notice of commercial marketing, but it has nothing to do with the L-7 patents. The L-7 patents are separate. I saw various places in the briefs that some, including the Amex briefs, that some significant weight seemed to be placed on the fact that this, in this case, in cases like this, there isn't anything that needs to happen during the L-8A period because of the fact that there are no L-7 patents, and I wondered whether that has significance for the way we read L-8A. Your Honor, the answer is no. Okay. Your Honor, one of the things, though, that's obviously before this Court is the decision in Amgen v. Sandow, and Amgen argues that in that case, the Court has determined in all circumstances L-8A must be read, the shall must be read as must. But that provision, as the Court noted there, cannot be read in isolation, just like the Court did not read in isolation L-2A. Importantly, Apotex chose here to go through the L-2A process. It provided the abbreviated BLA. And what does that do from a policy perspective? The Court there was concerned that without providing the L-2 provision and without providing a notice of commercial marketing, how would Amgen know what patents to actually bring a DJ action on? In fact, the Court said the subsequent failure to provide notice of commercial marketing doesn't apply. The subsequent failure. And that's what actually the title talks about, subsequent failures. And, in fact, the Court makes mention of the fact there was a complete failure to provide any of the patent exchange stance. And it said, so in this case, as in here, we find that it's mandatory. But for the same reasons the Court said under L-2A, because there's a specific remedy created by Congress for a specific statutory right, we must honor that right. It's not just the concluding sentence of the Sandovey-Amgen case that the majority wrote that is Apotex's basis for this. In fact, throughout the opinion, the Court notes and goes on to state, with respect to paragraph L-8A, we do not find any provision in the BPCIA that contemplates or specifies the consequence for noncompliance with the notice provision here. But what do they say? They distinguish this. They say, because Sandoz did not provide the L-2A information, Amgen was unable to compile that patent list. The judge acknowledges, however, while it is true that paragraph L-9B specifies the consequence for a subsequent failure to comply with paragraph L-8A after the applicant has complied with L-2A, it does not apply in this case. Your Honors, that's not this case. It does apply in this case. Where Sandoz did not comply with L-2A, they found it was mandatory. But they carved out a distinction, and that distinction is the same rationale that they used when they were looking at the L-2A. So based on the maximum statutory construction language that we've just talked about, and based on Sandovey-Amgen's rationale, we ask this Court to move for apotex in this case and vacate the preliminary injunction. Going back to the initial question of the fact that there is an exclusivity period, the 180 days, the amicus briefs and apotex lay out something that I think is important to note, and the District Court got this wrong. The District Court cited to the fact that this would be a unique situation where you would have to give this notice of commercial marketing and somehow it would end in a 12.5 year exclusivity period. Your Honor, that's just not the case. Because Sandoz elected not to make the L-2A information, this Court held that paragraph L-9B did not apply. However, the 180 day notice of commercial marketing provision, if that was mandatory in all cases, it would require that only after the effective date of FDA approval of any applicant's ABLA, would someone be able to give that notice of commercial marketing. Now, if I understand it correctly, the FDA is not authorized to grant or make its approval effective until after the exclusive period. But is it also prohibited from actually making the decision with respect to approval well before the expiration of the 12 year period? Your Honor, we're under a new statutory regime. Obviously, the BPCIA and the Court has acknowledged it's analogous to the Hatch-Waxman Act. But to answer your question, even if they gave tentative approval, the FDA guidance cited in the briefs, and I think the best link, the easiest one for me to point to, because it's at the end of the biosimilar counsel's brief on the last page, it cites to the link of the FDA guidance. And in essence, what it says is you cannot get FDA licensure until that 12 year exclusivity ends. So the triggering act, whether you call it licensure or approval or effectiveness, the triggering act, as far as the FDA is concerned, whether it's by statute or by practice in the FDA, is not going to happen until after the 12 year exclusivity period. Is that what you're saying? Correct. And if we read it to mean that this provision applies in all cases, there wouldn't be a single ABLA. And this one is a perfect example. There's only one patent at issue. The fact discovery is over. It closed on Friday. The Court has scheduled the trial for July. It's very possible that there's no patent left at issue in this case. And yet, if we read it mandatory, even though we followed the disclosure provisions of L2 and they've had our application for more than a year, and nothing has prevented them from bringing an injunction on the current patent, the one patent remaining, or any new patents under L7, we're not here on that injunction. Thank you. Good morning. So I think I'd like to start with the language of the statute, which is section L8A, which is unequivocal and says that the biosimilar applicant, the K applicant, shall provide this notice. Same language that was used in L2. Same, but some important differences. I mean, it was equally unequivocal. Until the Court decided. It's unequivocal. The language is unequivocal, but, Your Honor, this Court is being asked to rewrite L8A to put in language that actually appears elsewhere in the statute. What I mean is, there are places, for example, L9C, that say, if a subsection K applicant fails to provide the application and information required under paragraph 2A, then certain things. The apothecary's position is that this Court should rewrite section L8A so that it has that same language. That's the position that is being argued. The drafters of the statute knew how to write something that was contingent upon that fact when they wanted to, and they didn't put it in L8A. Now, Your Honor, I'd love to turn to why is there a different outcome with L8A versus L2A, and the answer is, as this Court held in the majority in the Sandoz case, there are other provisions, specifically section 271E2C2 and section 271E4 that provide, that define the failure to give, to comply with L2A as an act of infringement, and then in 271E4 specify the exclusive consequence for that. You cannot reach the majority of decision in the Sandoz case without that statutory underpinning. Again, the drafters knew how to specify an exclusive remedy when they wanted to, and what the majority of this Court found in the Sandoz case was that's exactly what they had done in L2 with respect to a failure to comply with L2. Let me throw the same question at you that I asked your opposing counsel. What purpose does the 180-day provision serve, as you interpreted it under the facts of this case? It serves a vital purpose for the parties, the judicial system, and the public, and let me explain why. What it serves is exactly the purpose that the unanimous portion of this Court's decision in Sandoz lays out. It provides a defined statutory period in which to resolve patent disputes before launch of the biosimilar, and there seems to be an argument that is made by the amici of Apotex, and perhaps by Apotex itself, that this right exists only with respect to patents defined in 8B. That is not so. This case is a perfect example. If you take away the notice provision, the 180-day block protected time in which to resolve patent disputes, what you do is you say to the patent holder, the reference product sponsor, you need to seek a preliminary injunction immediately when you file your lawsuit because you have no idea when the biosimilar is going to be launched, and your only alternative would be to wait, risk irreparable damage to the market, and when that irreparable damage begins, run into court and seek a TRO. What would have happened in this case were there no 180-day notice provision is that Amgen would have had no choice but to seek a preliminary injunction on the patents that it asserted, a proceeding that would have, we now know, been a complete and utter waste of time. Why do I say that? As Mr. McTighe mentioned, we have a trial date set for July. If Apotex got approval tomorrow and gave 180-day notice, we could have that trial, have a plenary decision on the merits, and then be in a position to move forward. It would never have been necessary to seek a preliminary injunction. Without the notice period, we would say, we have no idea when this product is coming on the market. We need to move for a preliminary injunction right now, and whichever party was unhappy with the outcome of that would doubtless have been in this court already saying you have to rule on a PI motion. So that is a perfect question. Particularly, even if you lost on the merits in the July trial, you would say that the 180 days has to continue to run? I think the reading of this statute is that's correct, Ron. And I think that, as the majority stated in Sandow's case, we have to take the statute as it's written. And what I would say here is the drafters of this statute knew that it was going to be almost inevitable, perhaps always inevitable, that there would be patent disputes in every biosimilar case. And they simply said, we're going to establish a bright-line rule. There is certainty value in having a bright-line 180-day period, and that's how the statute is constructed. And therefore, I think that that's absolutely right. And I think that what we see here is there's a misperception that figures, for example, in the briefs of Apotex's amici and many other places that talk about 12 years of exclusivity. Twelve and a half. Well, what they say, they start, I mean, it's an argument that assumes its own conclusion. It assumes that the biosimilar should have the right to come on the market at the end of year 12, and then says any interpretation of the statute that pushes that to 12 and a half must there ipso facto be wrong. If we look at what the BPCIA says, and this is 262K7, it says the FDA cannot make the approval effective until 12 years after the approval of the reference product. We know, because this court held it unanimously in Sandoz, that the notice provision can only be, effective notice under L8A can only be given after FDA approval. But that raises the question that I asked your opposing counsel, whether approval and effectiveness mean the same thing, or whether approval can predate the effective date. As Mr. McTyke said, I don't believe FDA has spoken on that. Your Honor, my response would be no. I forgot which way I asked the question. Well, it's something that happens to me frequently. That the FDA cannot give an approval in less than 12 years from the date of approval. While the 12-year period is pending. That's correct. Even if they're ready to approve, they have to wait for even the approval, never mind the effectiveness. That is correct, Your Honor, as we read the statute. Let me ask you another policy question. Again, what I ask your opposing counsel, what incentive would an applicant have to participate in exchanging patent information if the 180-year period is imposed no matter what? I'm not sure what the incentive they may have is that, exactly as Mr. McTyke said, that they wish to not launch at risk and incur potentially ruinous damages, and they wish to flush out whatever patents there are. This statutory regime has been deliberately architected to allow the players, and particularly to allow the biosimilar, if it wishes, to move forward and say, I would like to have resolved the patent issues before I go on the market and potentially incur billions of dollars of liability. That, to me, Your Honor, is the incentive. If they want to do that, then they have to go through that information exchange process. Following the holding of the Sandoz case, so no one ever uses this against Amgen, Amgen does not agree with the holding as it pertains to L2A, but following that, they're not obliged to make the L2A disclosure, but if they don't make the L2A disclosure, it becomes effectively impossible to then clear out or to obtain certainty regarding patents, and then they're taking a chance of saying,  The incentive, I think, is if the biosimilar wants not to take that risk, then it will make the disclosure. If it's willing to incur, at least in some level, that risk, it will not. But why do I say that we need that 180 days for the benefit of the judicial system? First of all, we don't want a situation where in every single biosimilar case it begins with a probably needless preliminary injunction motion. We don't want a situation where these products come on the market and then are yanked off the market. As the amicus, Amgen's amicus, the biotechnology innovation organization says in its brief, it is potentially harmful for people to have a situation where they switch back and forth between these products. They're not like generics. They're similar, not identical. And if there is a public harm to having a situation where a biosimilar is launched on the market, the patent holder moves for a preliminary injunction, the thing is yanked off the market after a month or two, and then it comes back on, the 180 days is intended exactly as this court held, unanimously in that part. And I'm talking about section 2bA of the Sandoz opinion. Its purpose is to prevent this type of chaos. It is to block protect a time in which patents, be they in the first phase of litigation or the second phase of litigation, can rationally be resolved. And I'd like to turn, if I may, to the argument of superfluousness, which seems to underpin the position of Apotex and its amicus. And it is not true that L9B would be rendered superfluous by Amgen's interpretation. A few important points. First of all, L9B does not give the reference product sponsor any more rights than it would already have if there were compliance under L9A. L9A allows, if notice is given, the reference product sponsor to bring a declaratory judgment action on a certain set of patents. L9B allows the reference product sponsor, if notice is not given, to bring a declaratory judgment action on the same set of patents. So there's no expanded rights. The reference product sponsor is getting nothing through L9B in compensation for the lack of notice. Except protection from a declaratory judgment action by the other side, if that's worth anything. Fair point, absolutely fair. But what I would say here is that what the reference product sponsor wants is the ability to enforce its patents and wants the notice. And so we look at that and say, well, are there situations where both, a reference product sponsor would both bring a declaratory judgment action that now committed by L9B and also seek to enforce a notice provision? Absolutely. What happens if the biosimilar launches? It's not actually shipped the product, but it's now going around to customers and saying, don't buy from Amgen, buy from Apotex. And Amgen knows that in a matter of weeks or so there will be real live 271A infringement, even if it's not happening now. And it says, all right, I want to bring a declaratory judgment action, but I equally want to go into court, which I'm now permitted to do under L9B. But I want to go into court and ask for the court to enforce my 180-day period. Say, give us 180 days, please, district court, in order to sort this out, because I plan to move for a preliminary injunction on these patents that I can now enforce. And I think that preliminary injunction will extend well beyond 180 days. But right now I want a status quo protecting 180 days to allow us to do that in an ordinary fashion. There's no redundancy at all between these. And the fundamental premise that underlies the argument by the appellant and its amici is just plain wrong in that regard. Now, lastly, I wanted to touch on this. Even if one accepts that L9B were a remedy to get to the outcome that the appellant wants to get to, one has to accept that it is an exclusive remedy. And that is manifestly not so. First of all, the remedy says... It refers to the ability to bring a declaratory judgment action under 28 U.S.C. 2201, which in itself makes clear that that remedy is not exclusive. The language of 2201 says a court can rule on an action brought under the Declaratory Judgment Act whether or not further relief is or could be sought. So I've got baked into that something that says it's not exclusive. And then the broader point, I would say, is that the rationale, the language, that drove the majority on the L2A issue in the Sandoz case is conspicuously absent here. So in the Sandoz case, the majority says Section 271E2C2 defines as an act of infringement submitting your biosimilar application and failing to provide the L2A information. That's the act of infringement. And then Section 271E4 says the remedies that are listed herein are the only remedies that can be given for an act of infringement under Section 271E2C2. And therefore, we've got an exclusive remedy provision baked into the BPCIA for that failure. There's absolutely no cognate to that for a putative failure under L9B. And so even if you were to consider it, if one were to consider it a remedy, it is in no way, shape, or form an exclusive remedy, and it doesn't thereby stand in the way of enforcement of the notice provision for the manifest benefit of the judicial system, the parties, and indeed the public. And if the court has more questions, I'm happy to do my best. No, I just have a comment, which is I suspect that given the competence and experience of counsel and the interest of entities like Amgen, around a year, 11 and a half, somebody puts their finger up in the wind and begins drafting some sort of preliminary injunction motion just in case. Obviously, these are huge products with lots of resources. But equally, that is true on the other side. And as we have seen in the Natch-Waxman context, there are certainly situations in which those who wish to will flood the market. I'd refer to the court, if the court is interested, to the so-called Plavix case in 2006 involving Apotex, in which, in a period of several days, it shipped a recollection serves a year's worth of product out into the marketplace. And by the time a TRO was sought, it was too late. That was gone. And so, yes, that by all means, but this is true on both sides of the equation. And the whole purpose of the 180 days is to prevent a situation where we have to have a fire drill over and over again in every single biosimilar case. And if this court doesn't effectuate that, I fear that's where we're going to be. We're going to see preliminary injunction motions and TROs on every single patent and concomitant appeals to this court. Let me, if I could just very briefly return you to a point you made earlier, which I don't think I fully understood. You were saying there is a situation where the applicant, the biosimilar applicant, would actually have an incentive to make an L8A disclosure or notification. What would that be? Well, I think the incentive there may be if I'm the biosimilar applicant and I'm about to launch into commerce a potentially infringing patent. And you think there's a potential for having a huge liability and I want resolution. I would rather... Because they're free to get that resolution by means other than taking a chance in the dark, right? I mean, that's... Well, not necessarily. Remember, they're not free to bring that declaratory judgment action unless and until they give the 8A notice. That's what L9A says. Neither side can bring an action, a declaratory judgment action, on Phase 2 patents unless and until the L8A notice is given. So if I'm the biosimilar and I say, I want to bring that declaratory judgment action, I want that certainty, of course I'm going to give the notice. But equally, there may be cases where I say, no, I'll take my chances. I'd rather... You know, it may cause catastrophic harm to the market, but I think there's a good deal of money to be made here and I'll do that. And that is why we have the 180-day block-protected period to say you can't do that. You've got to have... There has to be an opportunity. In the words of this court, in Sandoz, a defined statutory window during which the court and the parties can fairly assess the parties' rights prior to the launch of the biosimilar product. Thank you, counsel. Thank you. Mr. McTighe, we'll give you a couple of extra minutes if you need it. Thank you, Your Honor. I'll make that $350,000. Your Honor, Apotex isn't asking to rewrite L8A, as counsel said, any more than it is asking this court to rewrite L2A. What it is asking is this court to give context to the remedial provision that is there in L9B for a violation of the L8A commercial marketing provision. Counsel has pointed out, in response to one of the court's questions, that the L9 provisions, L9A, prevents either party from actually filing a DJ on those subsequently listed patents. But by not giving the notice of commercial marketing, the BLA is making a choice that Congress intended. That choice is you don't get the right under L9B to bring a DJ action. In fact, under L9C, the RPS can bring a DJ action that way as well. So under any scenario, counsel's right, the RPS can bring a DJ action. But only one scenario where the ABLA chooses not to give the notice of commercial marketing, can it go for the certainty of the second set of patents. Now, what counsel is actually saying, and he noted that even if no patents are at issue, that this statutory-based relief, injunctive relief that's extra statutory and not part of the scheme, should apply in all cases. In so doing, what counsel is saying is even though L is based, the title of L is patents. Where no patents are in dispute, the extra statutory remedy of a preliminary injunction should be available to it in all cases so it can have patent certainty. This court has said, the Supreme Court has said, in Whitman versus American Trucking Association, where Congress has held fundamental details of a regulatory scheme in vague terms or ancillary provisions, it does not, one might say, hide elephants in mouse holes. The elephant in the room here, Your Honor, is whether or not they can have 12 1⁄2 years exclusivity. And they're trying to get that elephant through a mouse hole by saying even though it's not listed as a specific remedy, we think it's okay for a court to take that extraordinary remedy for the potential to stop a biosimilar from launching into what isn't just for Amgen. It's a carefully balanced statute that allows the biosimilar applicant and patients around the country to actually benefit from the Affordable Care Act and competition. There are choices to be made and there are consequences from those choices. Apotex chose, unlike Sandoz, to provide its information, to provide its BLA and its manufacturing information. Amgen is not prevented, as we sit here today, from bringing that injunction today. They pled it in their complaint, both for preliminary and permanent injunctive relief. We are not here under L, the patent part, for the merits of their one remaining patent. And nothing prevents them from bringing new patents. And in fact, if they did, Apotex, like any other BLA, would have to make a decision whether or not to launch in the face of additional patents. It's the same thing that happens in the Hatch-Waxman context. There might be other patents out there. What the statute doesn't require is complete certainty. And although Amgen would like to say the Congress intended there to be complete certainty, and that's why the extra 180 days is there, there's actually an incentive, of course, for the applicant, the K applicant, to give that notice of commercial marketing. We've talked about it. But also... The incentive that Mr. Groomridge was talking about? The incentive to avoid the risk of large liability and the uncertainty? Sure. There's an assessment that every counsel, every company must make if they must launch and the patents are not precluded from launching because of an exclusivity. But more importantly, when we look at the incentives and the way that Sandovi-Amgen came down with, by ruling the way that the plain language of the statute and saying, if you give the L2A notice, if you go down that pathway, if you make that choice, you're not bound by L8A as mandatory. So there's an incentive written into the statute for you to go down the patent exchange information phase at the outset. And that actually helps with patent certainty because you can go through that discovery process, which we've completed. You can put forth the patents that Congress intended to be litigated early. You can have the assessment for the... I'm finishing up, Your Honor. You can have that assessment for not only the Amgens of the world, but the biosimilars who are trying to bring biosimilar competition under the Affordable Care Act. Thank you. The matter stands submitted and this court is adjourned. Thank you.